## GOSS PRINTING–PRESS CO. v. SCOTT.

(Circuit Court of Appeals, Third Circuit. February 20, 1901.)

### No. 9.

1. PATENTS—INVENTION—PRINTING MACHINES.

The Firm patent, No. 415,321, for an improvement in rotary printing machines, relates to multi-roll web-perfecting presses, and covers what is known as the "straight-line" press, as distinguished from the "angle-bar" press, formerly in use. In the latter two sets of form and impression cylinders circumferentially headed were placed side by side. One web passed entirely through the machine in the same vertical plane, while the other, after being printed, passed around an angle-bar, by which it was turned completely over, and transferred laterally the distance of its width, where it was brought into register with the first. In the machine of the patent two or more sets of cylinders are banked one above the other, so that the webs are in the same vertical plane during the entire operation, and after being printed are brought together in register to be cut and folded. The straight-line presses have

gone into extensive use, and have the advantage of occupying less floor space, and, by the elimination of the angle-bar, of being much less liable to break the web and cause delay, which is a consideration of the highest importance in newspaper presses. *Held*, that the machine of the patent was not only novel, but useful in a marked degree, and disclosed patentable invention, and not merely mechanical skill, in view of the fact that press construction was mechanically a highly-developed industry, and yet no step had been previously taken towards the form of construction shown. Claim 7 also *held* infringed.

2. SAME—DUPLICATION OF KNOWN MECHANISMS.
   A duplication or combination of well-known mechanisms may amount to patentable invention, where they co-act to produce a new and improved result.

3. SAME—UTILITY OF DEVICE—ESTOPPEL OF INFRINGER TO DENY.
   The fact that a patent has been infringed is sufficient, as against the infringer, to establish its utility.

4. SAME—SUIT FOR INFRINGEMENT—TITLE OF COMPLAINANT.
   A reassignment of a patent by a corporation to the patentee in accordance with the terms of the original assignment, although it may have been voidable under the laws of the state, where it was unchallenged by the corporation, its stockholders or creditors, conveys a title which, in the hands of a subsequent bona fide assignee, will sustain a suit against an infringer.

5. SAME—INVENTION—PRINTING MACHINES.
   The Firm patent No. 410,271, for a printing machine, claim #6, which relates to a change in the construction of the cutting and folding mechanism of the machine of the prior patent, No. 415,321, to the same inventor, shows only a mechanical modification, and is devoid of patentable invention.

6. SAME.
   The Firm patent No. 529,680, for a printing machine, claims 11, 12, and 13, which cover mechanism for cross-associating the product of two or more independent presses placed side by side, so that the same shall be folded together to constitute parts of the same newspaper, involve merely mechanical changes, and are void for lack of patentable invention.

Appeal from the Circuit Court of the United States for the District of New Jersey.

For former reports, see 89 Fed. 818, 103 Fed. 650.

C. E. Pickard and L. L. Bond, for appellant.

B. F. Lee, for appellee.

Before DALLAS and GRAY, Circuit Judges, and BUFFINGTON, District Judge.

BUFFINGTON, District Judge. The bill in this case charges infringement of claim 6 of patent No. 410,271, granted to Joseph L. Firm on September 3, 1889, for a rotary printing machine; of claim 7 of No. 415,321, to said Joseph L. Firm on November 19, 1889, for a rotary printing press; and of claims 11, 12, and 13 of patent No. 529,680, to Joseph L. Firm, assignor to the Goss Printing Company, on November 20, 1894, for a printing machine. These patents relate to web-perfecting presses. A web-perfecting press is one which feeds itself with a long, continuous roll of paper, perfects or prints such paper on both sides by passing it between two sets of form and impression cylinders, and, by transverse cuts, severs the web into sheets. In a multi-roll web-perfecting press, two or more such webs are fed into its separate adjoining printing mechanisms, and are simultaneously

perfected. The separate webs are then brought into conjoint register, and thereafter transversely cut into sheets. The registered sheets are properly folded, sometimes after cutting, sometimes once before and once after, and then delivered. Folding and delivery are done by mechanisms separate from the printing, and do not concern the present case, further than as adjuncts to take care of the press output. To fairly appreciate and justly weigh what, if anything, Firm, the inventor, added to this art, it is necessary to give due regard to the peculiar conditions incident to the successful operation of these great presses. Unlike the use of most mechanism, time is of the very essence of the machine. The continuous web darts through the press with lightning speed. It enters a blank, and emerges a folded newspaper. Presswork is held back until the last possible moment, but, when once started, the press must finish its work at a predetermined time. Its operations must be continuous and uninterrupted. A break in its mechanism, or in the web on which it works, increases the possibility of delayed papers, trains and mails missed, and loss to the owner of money and prestige. Unlike the output of other commercial machinery, where the product of one day could, for substantial purposes, as well be made the next, the output of one of these presses is limited not to a question of days, or even hours, but to one of minutes. No one who has noted the feverish anxiety incident to the early morning hours in a newspaper office,—an anxiety which grows more feverish as the time grows shorter, and ends only when the edition is safely launched,—can be oblivious to the fact of how vital and important are the mechanical factors which save or avoid the loss of minutes in a great printing press. Firm's device was meant to minimize the liability to such losses of time. Let us consider what he did. Take, for example, the press of the St. Louis Globe-Democrat, as embodying the most advanced type of the prior art in those features to which the Firm device particularly applied. It printed from two rolls of paper,—one double width, or four plates wide; the other of single width, or two plates wide. Each roll was perfected by its own press. The two presses faced each other, with axes of their form and impression cylinders parallel to each other. In the main press, a four-plate-wide web was printed on both sides, four pages abreast, the column rules running around the cylinders. Consequently the printed columns were parallel with the web sides. The printed matter on these four-abreast pages constituted component parts of a single newspaper, and the press was designed to superimpose two of these printed pages upon the other two in correct register. This was effected by mechanism which we will describe; and, as Firm's device secured the same result without the use of this mechanism, it will be apparent that a study of such mechanism and the objections, if any, thereto, will lead to a just appreciation of what Firm subsequently did. In the Globe press, the double-width web, after being printed, was slit centrally and longitudinally by an ordinary rotary slitter. One of these split sheets, printed, it will be observed, on both sides, and constituting four printed pages of the proposed paper, continued to travel forward in its original vertical plane. The other sheet, likewise printed on both sides, and constituting four

other pages of the paper, passed downward and over a "turner," or an equilateral and right-angled triangle placed apex down, and depending vertically below the web-slitting roller. The effect of passing the sheet downward over one side of the turner, across and upward over the other side, was to reverse the web, turn the lower side up, and also transfer the whole web laterally a distance of its own width, and place it directly beneath the other half of the web, which, as we have seen, had continued to travel forward in its original vertical plane. The path around the turner was so proportioned as to be practically a multiple of the page lengths, and, by mechanism which need not be described, the two sections of the split web were assembled or brought together with their transverse margins in register, led forward to suitable folding and delivering apparatus, and an 8-page paper was produced, folded, delivered, and cut transversely on every margin. This method of securing register by transfer around the turner, commonly known as the "angle-bar system," we note as the highest development of the then art in that regard. Later we will refer to the other part of the Globe press, which was used to produce a 12-page paper, and will show, as evidencing the patentable, inventive character of Firm's improvement, that although this press, in its relation to the principal press, contained some of the mechanical elements of construction embodied in Firm's straight-line presses, even its constant operation in close proximity to the other press suggested to no one the embodiment of its particular functions and relations in the multi-web or principal press. It will be noted that in the first-described press one portion of the web travels forward in its original vertical plane through the entire operation, while the other was deflected from its original vertical plane, turned completely over, transferred across to the vertical plane occupied by its fellow, and there cross-associated with it. But Firm conceived the idea of printing his whole paper by the same, simple, straight-ahead method, so followed by one of the Globe webs, and thus do away with the use of angle-bars, and wholly dispense with the circuitous process of turning the second web completely over, and transferring it across its own width into the vertical plane occupied by its fellow. He did away with all the machinery incident to such process. The means by which he accomplished this were of a relatively simple character, and from the fact that the web, during the printing and registering operation, travels straight ahead, his type of press has come to be styled a "straight-line," as contrasted with an "angle-bar," press. His device is illustrated and described in his patent No. 415,321, for a rotary printing machine adapted for printing a number of copies of a 4, 6, 8, 10, etc., paged paper or pamphlet.

In the drawing from the patent here shown, the webs, m, n, and o, are initially placed in the same vertical plane with each other, and in such plane they continue to move forward until they are printed and in register. The letters, a, b, c, d, e, and f, designate form, and g, h, i, j, k, and l, impression, cylinders. On each of the form-cylinders are arranged places for eight forms, each set of four forms occupying nearly a semi-circumference. The relative arrangement and relation of the forms on the several cylinders need not here be detailed it being sufficient to say that the kind of press here illustrated

Fig. 1.

is adapted for printing two copies of a 24-page paper or pamphlet; and by allowing certain of the cylinders to remain idle, or altering the form arrangement, newspapers or pamphlets with a less number of pages may be printed. The three webs pass in the initial vertical plane between their respective form and impression cylinders where they are printed. They then pass through the respective sets of cutting rollers, p, q, and r, where, by means of a mediately placed circumferential knife on one roll and a corresponding groove on the

108 F.—17

other, the web is longitudinally split on the central margin, leaving two pages abreast on each side. Passing from these sets of rolls, the three webs are guided into position on top of one another, and enter the tension rolls, s, t, in correct register, and on the initial vertical plane. Passing through this set, the assembled and registered webs are carried to the driven rollers, u, v, which exert upon the webs the pull required to draw them from the form and impression cylinders. These rollers also serve as transverse cutters, carrying, as they do, a knife with alternate cutting and perforating teeth, so that the paper will be partly cut and partly perforated across the margin at the page ends. It is not necessary to follow the printed and properly assembled webs through the folding and delivery process, as they have no bearing on the patent. It will be noted that in this device the page forms are all headed circumferentially and in the same direction around the form cylinders; that the webs move in the same vertical plane, along ultimately converging paths. The same vertical plane intersects the central longitudinal margin of all the webs, or any line parallel therewith, from the time the webs leave their respective rolls to the point where they converge, printed and registered. It is this feature that gives such a type of press in the art the name "straight-line" or "straight-run," as distinguished from "angle-bar," or presses where the web is deflected and transferred to a different vertical plane.

We are then brought to the question whether the combination here shown was novel, useful, and patentable. That it was novel, the court below found, and our research in the art leads us to the same conclusion. Was it useful? That it was not alone useful, but useful to a marked degree, the weight of the testimony, and a consideration of the practical results attained, show. Indeed, the contest waged in this case, its extent, expense, and warmth, are in themselves a reasonable measure of the opinion of all parties in that regard. It is improbable that men will render themselves liable to actions for infringement unless infringement be useful. And the fact that a patent has been infringed by a defendant is, as against such infringer, sufficient to establish its utility. Lehnbeuter v. Holthaus, 105 U. S. 96, 26 L. Ed. 939; Vance v. Campbell, 1 Fish. Pat. Cas. 483, Fed. Cas. No. 16,-837. Moreover, we regard the change made by Firm as both novel and useful to a marked degree. The defendant's own proofs show that, in estimating the product of printing presses, about 25 per cent. must be deducted for delays, and that one of the two principal causes of stoppage is web-breaking. When a web-break occurs, the sheet winds around the roller, the press must be stopped, and the web torn off the rolls and rethreaded. The serious results incident to such stoppage will appear when we realize that these presses are speeded to 200 revolutions a minute, and that a delay of five minutes means many thousand less papers, varying according to the press capacity. The marked tendency to print larger papers, to issue greater editions, and to sell the papers for less money, necessitates the use of a cheaper paper, and cheaper paper means greater liability to web-breaks. After a most careful examination and analysis (the details of which need not here be set forth) of the testimony of the witnesses, and with

a due regard to the opportunities different witnesses had for observing presses in regular work, we have reached the opinion that web-breaks are much more frequent on angle-bar than on straight-line presses, and that inferior grades of paper, which could not be safely used on angle-bar presses, can be used on straight-run ones. The data given from actual observation in these respects is not only convincing, but is wholly in accord with our everyday observation, that, if the pull is evenly distributed over an entire sheet of paper, its tensile strength is much greater than when the strain is on one edge. It is, to our mind, clearly proven that Firm, by eliminating angle-bars, made an important improvement in lessening web-breaking. But this was not all. In dispensing with angle-bars, we are satisfied he lessened power requirements,—a fact which is not controverted in the proofs produced,—and made possible a simpler and more desirable type of mechanism; one in which there was less liability to break. A direct, forward, straight-line action from start to finish is mechanically preferable to a deflected, tangent-carried power. In addition to this, the facts proven show that straight-line presses can be built to occupy less floor space than angle-bar machines,—an important feature in mechanism and appliances in city manufactories, on account of the value of city sites generally, and in newspaper plants especially so, from the fact that they are always located in the most prominent parts of a city, and where ground is much more valuable.

Such being the facts, does this device involve invention? In support of its patentability, we have the prima facies arising from the grant of the patent. Lehnbeuter v. Holthaus, 105 U. S. 94, 26 L. Ed. 939. We have the fact that the device has gone into extensive use,—an element entitled to regard. Smith v. Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952. It is contended the changes made by Firm were merely mechanical, and that in reality he but took the presses which he found standing side by side, and banked them one upon another; that the change involved was mere reconstruction, rearrangement, duplication. It is to be noted, however, that printing-press construction is mechanically a highly-developed industry. The complex and intricate details of these great presses; the calls upon them for speed, strength, and product; the constant demand upon builders for improvement; and the keen rivalry existing among such builders and the users of the presses,—are factors which brought the art to this high mechanical standard. The very fact that, with all these stimulating considerations, insuring the most rapid strides in mechanical advance, no such step as Firm's was taken in duplex presses, shows that Firm's change was not in the line of mechanical progress, but in the original, inventive sphere. Granted the change consisted in banking one press upon another, yet the two, when so combined, and in their new relation, so co-acted as to dispense with angle-bars, with a web-deflected course, and made possible a straight-line duplex press. A single straight-line press in itself was no novelty, so far as the straight-line printing of an individual web is concerned; but, when the product of two such presses were united, it was only through angle-bar agency. Firm's device, by placing the two in new relations, eliminated the angle-bar, did away with the tangent-turning webs, and

thus secured valuable results. The test in such cases is not whether duplication exists, but whether duplication produces, not mere duplication of product or function, but a new unitary, additional result, and not the mere aggregate of prior, separate mechanism. The mere elements of the combination are immaterial. 'In their individual relations they may be old, may be mere duplicates; but the test is not the character of the combining elements, but the result flowing from their being combined. "Duplication producing a new and a useful result, as it was here produced, may be patentable. It is often the material part of a discovery, because it may be that which renders useful what was previously useless." Parker v. Hulme, 1 Fish. Pat. Cas. 44, Fed. Cas. No. 10,740. Consideration of another feature of the Globe-Democrat press referred to above.will also show that the change Firm made was more than mechanical. As we have seen, that press was made up of a main duplex press, already described, and a second part used for printing a half-width web. When it was desired to make a 12-page paper, the main press was used to print 8 pages in the manner heretofore described, and the other 4 were printed in the supplemental press. In it but one pair of form and impression cylinders were used. These, however, were of such lengths as to carry four plates abreast on each semi-circumference. The plates at one end contained the matter for the outside, and those at the other for the inside, of the 4-page sheet. A two-plate width web passed between the plates at one end of the cylinder, and was printed on one side. It then, by means of rollers, passed down, over, across, and upward over a turner or angle-bar, which reversed the web and transferred it laterally a distance equal to its own width. The web was then made to pass between the form and impression cylinders at the other end, where its other side was printed. By this means the supplemental web was transferred from its own initial vertical plane, and brought into the vertical plane of the associated halves of the main web, and, by means not necessary to detail, was brought upward and run between these two associated halves, and in register with them. The three then pass together to the folding, cutting, and delivery mechanism. It is curious to note, but, in the light of subsequent development of the art, be it observed, that this machine might have been modified and re-created so as to embody Firm's device. If the supplemental press had been equipped with two sets of form and impression cylinders, it is quite clear the web could have been started on the same initial vertical line occupied by one-half of the web in the other or main press. This would have given straight-line work in both presses, where the supplemental press and one side of the main press alone were used. And, if the other side of the main press were banked above its fellow, all three would have been straight-line presses. But the all-sufficient answer to an imaginary machine such as this being an anticipation is the fact that no one either changed the Globe press, or suggested the possibility of such change. Its resemblance to Firm's device, and its use for several years without any one suggesting such a modification, make it all the more apparent that it required more than mechanical advance to make a straight-line press out of the doubly angled-barred Globe-Democrat press. It is

not nearness to an unsolved problem, but a solution of it, that secures practical results, and benefits the public to the extent of earning the grant of a patent in return. Upon this device the seventh claim, which reads as follows: "In a rotary printing machine in which the several pages of a book or newspaper are printed upon a plurality of webs, in combination, the impression-cylinders, the form-cylinders, page-forms thereon, the rolls whereby the webs after being printed are guided into position on top of another, and cutters by which said webs are severed transversely between the succeeding rows of pages, the page-forms being arranged upon the several form-cylinders with their heads pointing all in the same direction around the cylinder, the forms for these pages to constitute the first half of the book being located upon corresponding zones of the various form-cylinders, and the forms for these pages to constitute the last half of the book being arranged upon other corresponding zones on the various cylinders side by side with the zones in which the forms for the pages of the first half of the book are located, whereby, when the webs are run out over one another, without turning or reversing, the several pages belonging to the first half of the book will arrange themselves above each other, and the several pages belonging to the last half of the book will arrange themselves above each other side by side with those belonging to the first half, substantially as described,"—was granted. It was allowed in the form in which it was originally presented. We are of opinion the charge of infringement is sustained. The proofs show the respondent's infringing machines are three-roll, two-plate-wide machines; that they have form and impression cylinders, and the forms are imposed upon the form-cylinders with reference to the position of the column rules; that the webs, after being perfected in these presses, are guided by means of rolls into position one above the other. It is also shown that the webs are severed transversely by means of cutters between the succeeding rows of pages; that is, upon every transverse margin. The page-forms are so arranged upon the form-cylinders that when the webs are printed the heads of the pages all point in the same direction. The forms for the pages to constitute the first half of the book are located upon corresponding zones of the various form-cylinders, and the forms for these pages to constitute the last half of the book are arranged upon other corresponding zones on the various cylinders side by side with the zones on which the forms for the first half of the book are located. It is also shown that, when the webs are run over one another, it is done without any turning or reversing of the web; and when the several pages belonging to the first half of the book arrange themselves above each other, and the several pages belonging to the last half of the book arrange themselves above each other, side by side with those belonging to the first half, there has been neither turning nor reversing of said pages. It is a wholly straight-line run. The respondent, however, contends that the "turning or reversing" of the latter part of the claim is a limitation upon the operation of that element in the former part of the claim, viz. "cutters by which said webs are severed transversely between the succeeding rows of pages," and that, because in the infringing machine the cutting is done after longitudinal

folding, the cutting is not done without "turning or reversing." Assuming for present purposes that a longitudinal fold is a "turning or reversing," in the sense in which those words are used in this claim, we find no limitation as to the position of said cutters, or the mode of doing, save that the "webs are severed transversely between the succeeding rows of pages." In the absence of such limitation in the claim, it is clear to us that the respondent cannot avoid infringement by making his transverse cut subsequent to the longitudinal fold. His machine embodies all the individual elements of the claim, and they co-operate with each other in the same manner to produce the same result.

The title of the complainant to patent No. 415,321 is questioned. The legal title to this patent is duly vested in the complainant by sundry assignments of record in the patent office, as follows: Assignment of Joseph L. Firm to the Firm Printing-Press Company, dated November 22, 1889; assignment of the Firm's Printing-Press Company to Joseph L. Firm, dated July 24, 1891; and assignment by Joseph L. Firm to the Goss Printing Company, dated January 30, 1892. These several assignments, all in due legal form, were made by the several parties thereto, and stand unchallenged by any of the parties to said several conveyances, their creditors or cestuis que trustent. In view of the fact that the respondent's infringers have no interest in or claim to said patent, and that they do not assert that any legal or equitable title to said patent is asserted by any one else, or is in fact now outstanding in any one else, it might be sufficient to hold that for the purpose of this case, and as against mere infringers, the prima facie record title should suffice to warrant a decree. We will, however, consider at length the facts shown. On June 20, 1888, Joseph L. Firm, by two separate instruments in writing, assigned his interest in certain patents to the Firm Printing-Press Company. Both assignments provide:

"This assignment is made upon the express condition that said Firm Printing-Press Company shall not sell, assign, or transfer the whole or any part of said letters patent to any person, corporation, or association whatever without first giving to me, the said Joseph L. Firm, sixty (60) days' previous notice, in writing, of its intention to sell, assign, and transfer the same, and also giving and granting to me, the said Joseph L. Firm, the first and absolute right and privilege to purchase of said company said letters patent at the same price offered by any other person, corporation, or association."

On the same day an agreement in writing was entered into between Firm and the Firm Printing-Press Company which recited that Firm, as a part consideration for the Firm Company taking said assignments, had agreed to enter into a written agreement—

"To assign to the said party of the second part [the said Firm Printing-Press Company], so long as it exists and continues to do its business for which it was incorporated, all letters patent which may hereafter be issued to him for improvements in printing presses."

The agreement then provided as follows:

"Now, therefore, this indenture witnesseth that the said Joseph L. Firm, for and in consideration of one dollar and other good and valuable considerations, the receipt of which is hereby acknowledged, doth hereby agree to assign to the said Firm Printing-Press Company, so long as it shall exist and

continue to do the business for which it has been incorporated, upon the same terms, conditions, and agreements as the assignments hereinbefore referred to were made, all letters patent which may hereafter be issued to him for improvements in printing presses: provided, the said party of the second part shall advance, pay, and discharge all fees, charges, and expenses which shall or may be incurred in procuring such letters patent. And the said Firm Printing-Press Company, for and in consideration of one dollar and other good and valuable considerations, the receipt of which is hereby acknowledged, doth hereby agree to reassign to the said Joseph L. Firm any and all letters patent which he may hereafter assign to it, if at any time the said Firm Printing-Press Company shall cease to exist or shall cease to do the business for which it has been incorporated."

It will be observed that, as to the patents covered by the two assignments then made, the conditions were that Firm was to have an option to purchase them on 60 days' notice, if the company desired to sell; in the case of assignments of patents to be thereafter granted, not only was the above condition to be inserted, viz. "upon the same terms, conditions, and agreements as the assignments hereinbefore referred to were made," but he was as to thereafter granted patents "to assign to the said Firm Printing-Press Company, so long as it shall exist and continue to do the business for which it has been incorporated." Moreover, it is to be noted that the Firm Company expressly bound itself to reassign all patents thereafter assigned to it by Firm if the company "should cease to exist or shall cease to do business for which it has been incorporated." Thereafter, to wit, on November 22, 1889, Firm conveyed patent No. 415,321 (which was applied for January 17, 1888, and was granted November 19, 1889) to the Firm Printing-Press Company. The assignment contained the condition recited in the two original assignments, dated June 20, 1888, which, as we have seen, was in accordance with the agreement between the parties, dated the same day, to be one of the conditions of the assignment. The other agreed-upon condition, viz. "so long as it [the Firm Company] shall exist and continue to do the business for which it was incorporated," was not inserted. The omission of such clause might cause difficulty, were this all; but this assignment, being of subsequent date to the agreement of June 20, 1888, must be deemed to have been accepted by the Firm Company subject to its agreement to reassign upon certain conditions. The language of the Firm Company's covenant is broad enough to embrace it. The two instruments should therefore be construed together. This patent application was evidently in the mind of the parties when the agreement of June 20, 1888, was made, for it was then pending. The assignment was presumably made in pursuance of that agreement. No additional consideration is shown to have passed to Firm for such assignment. Under all the facts, we are warranted in construing the two instruments together, and in holding the Firm Company were bound to reassign on the condition stated. While, at first view, such a conditional title might seem at variance with the provisions looking to a sale by the company, yet, when we consider that Firm was a large stockholder in the company, it may be possible that circumstances might arise when the company, while still continuing its general business, might deem it advisable to sell these particular patents, and it would be to his interest to have them sold. It will be ob-

served, too, that the company considered itself bound to reassign this patent in case it ceased to do business. By a resolution of its board at a meeting held July 23, 1891, the company admitted that such was its obligation, and authorized its officers to reassign, inter alia, the patent in question, and a reconveyance was accordingly made to Firm by the company on July 24, 1891. The company had ceased to do business. It had no means to carry on the object for which it existed. The time had come for it to comply with its covenant to reassign. This duty it performed. Neither the company itself, any of its stockholders, its receiver, nor its judgment creditor have questioned this transfer. The title was held by Firm, thus unchallenged, until January 30, 1892, when he conveyed the patent to the complainant company. Its title has remained unquestioned since that time.

It is alleged the conveyance from the Firm Company to Firm was void by reason of the New York statute which so declares to be certain corporation transfers to its officers for the payment of any debts. We have been cited to no decision of the courts of that state holding that when such transfer has been made, and is unchallenged by the corporation, its receiver, its judgment creditors, or any stockholder, the transfer shall, at the instance of a stranger in interest and title, and against an innocent purchaser from the corporation's grantee, be adjudged absolutely void. In the absence of such construction, we are of the opinion that the title acquired by the complainant was, if, indeed, questionable, not void, but voidable, and, in the absence of any step to avoid it, must, for the purpose of this case, be deemed to vest the legal title to the patent in question in the complainant.

In accordance with these views, the judgment of the court below will be reversed in so far as patent No. 415,321 is concerned, and the record will be remitted, with directions to enter a decree in favor of the complainant, with an injunction and an accounting.

Firm's later patent, No. 410,271, is a modification of the general straight-line device shown in the patent we have discussed. It has substantially the same arrangement of form and impression cylinders, thus constituting a straight-line press. They both operate in the same way in printing, splitting, and assembling the webs in correct register. After these operations are completed, the patent in suit takes one of the printed, split, and assembled web sections, and deflects it from its straight-line course, in order to fold it longitudinally and cut it transversely. This is done by placing the folding rollers and transverse cutting knives at right angles with the printing rollers, as is recited in the sixth claim. To us it is clear that this claim is for a mere mechanical device. Stripped of the straight-line feature, which we have seen was disclosed in Firm's prior device, the combination of this claim shows nothing but mechanical modifications based on that original. Complainants themselves concede that a V-shaped roller, over which the web is drawn by the folder rollers, was well known in the art for that purpose. There was nothing novel in the form of the rolls or the mechanism or arrangement of the cutting knives. The combination of formers and rolls for folding was not new. It required no inventive genius to place these rollers at right angles with an already devised straight-line press, so as to place the two in opera-

tive relation. Clearly, such work was in the sphere of mechanical adaptation. We are therefore of the opinion that the court below committed no error in finding that claim 6 of patent No. 410,271 was void.

Claims 11, 12, and 13 of the third patent in question, No. 529,680, refers to the general type of mechanism of the sixth claim of Firm's patent, No. 410,271, a combination which we have already held void of patentability. The press of that claim was constructed to print complete newspapers, side by side, on independent straight-run presses. The webs of one set of banked presses ran through on its own initial vertical plane and printed a complete paper, and the webs on its adjoining banked duplex did the same thing, printing a separate copy of the same paper. There was no suggestion in the patent of bringing the paper printed on one set of presses over to and associating it with the paper printed on the other, and making a single paper of twice the size. The object of the devices embodied in the claim of patent No. 529,680 was to cross-associate the products of series of banked duplex presses, and make newspapers of double the size of those printed in presses run without such cross-association. Thus the specification states:

"This invention relates to improvements on the letters patent issued to me September 3, 1889, No. 410,271. In said patent is described a printing machine in which a plurality of webs, after being printed upon, are split longitudinally and severed transversely between the pages, and all conducted to one double folding device, located at right angles with the printing machine proper. In my present machine, I employ three double folding devices, and various improvements in the details of construction by which I am able to facilitate the work and to increase the capacity of the machine so far as the range of page combination is concerned."

With that end in view, he placed side by side three duplex presses of the type of No. 410,271, each of which was adapted to print, register, cut, and fold individual papers, as recited in said patent. They were each provided with separate, individual mechanism, and adapted to run wholly independent of all the others. In case it was desired to cross-associate the product of two such adjoining presses, it will be noted that such cross-association does not begin until the separate and individual work of each press had completed the operations of printing, registering, folding longitudinally, and partially severing transversely their respective webs. At this point the web of one side, which otherwise would have continued to pass through the remaining mechanism of its own particular press, is, by a certain roller being thrown into engagement, deflected from following such course, and carried across to and associated with the other longitudinally folded web. From this point forward, the two webs are carried forward by the same mechanism, and subjected to the same process of complete transverse severing into sheets and folding, that the product of that individual press would have been, had no such cross-association taken place. Conceding that this was the first time, in presses of Firm's type, that cross-association was shown, and that the means by which it was there accomplished was novel, still we are of opinion the combination did not involve patentability. The functions of the two presses were not changed. A connection was made between them,

and the product of the one subjected to the operation of the other. The connection by which this was done was a mere mechanical improvement, and which one skilled in that art could solve. This idea of so coupling up two presses so as to print larger paper was but the natural advance incident to new demands upon the art. Reference to the patent shows the exceedingly simple mechanical means by which cross-association is made:

"When it is desired, as in the case of twenty-four page paper, to combine both halves of the web, by having the roller, q, mounted upon a pivoted arm q¹, pivoted concentric with the roller q², the roller, q, may be swung up into position shown in dotted lines in Fig. 3, and then that half of the web which would otherwise be treated by the folder, B¹, after being perforated transversely, may be conducted across, as shown by the dotted line, Fig. 3, into position on top of the half web passing through the folder, B², the parts being so distanced from each other as to cause the pages to properly index. From this point forward, the complete severing and final folding and delivery of the two halves of the web are done together, as already described for one half. By having both rollers, q, mounted on pivoted arms, both halves of the split web may be sent either to the folding mechanism, B, at the right of Fig. 3, as shown in dotted lines, or to B¹, at the left, as will be obvious."

From this it will be seen the transfer is a simple mechanical process, effected by simple, well-known, mechanical agents. Of course, such cross-transfers necessitate relative page rearrangement and combinations, but they are within the knowledge and skill of those familiar with that branch of the art. For the reasons stated, we are of opinion the combinations shown in the three claims in question do not involve patentability, and are, therefore, void, as found by the court below.

The decree of the circuit court is reversed, and the case will be remanded to that court, with direction to enter a decree for the complainant in conformity with this opinion, but without costs to either party, and providing that one-half of the costs payable to the officers of that court shall be paid by each of the parties, respectively. It is further ordered that one-half of the costs of this appeal shall be paid by the appellant, and one-half thereof by the appellee.