CHARLESTON ICE MANUF'G CO. v. JOYCE.

(Circuit Court of Appeals, Fourth Circuit. October 2, 1894.)

No. 84.

1. CONTRACT FOR BORING ARTESIAN WELL—CONSTRUCTION.
     Whether a 12-inch artesian well is one which has a bore of 12 inches, or one which, after being cased, has a flow of 12 inches, depends on evidence, and is a question for the jury.

2. SAME.
     In an action against a corporation on a contract for boring a 12-inch artesian well, it appeared that plaintiff sunk a well having a 12-inch bore, with the knowledge of defendant's agents, and under the supervision of its vice president and chief engineer, without any suggestion that the work was not being done in accordance with the contract. Held, that the jury properly construed the contract to mean a well having a 12-inch flow after being cased.

3. SAME—RESCISSION BY MUTUAL AGREEMENT.
     The contract gave plaintiff the privilege of changing the size of the well to 8½ inches, but required him to carry a 10-inch hole to a depth of 1,300 feet, if possible. When a depth of 1,016 feet was reached with a 10-inch pipe, it was impossible to drive it further with the 1,100-pound maul in use, and there was danger of the pipe's collapse if it was driven further, and plaintiff proposed to use an 8½-inch pipe. Such facts were stated to defendant's vice president and chief engineer, and to its treasurer and manager, the president being absent. These latter asked permission to use a maul weighing 4,000 pounds at their own risk and expense, and continue with the 10-inch pipe, and agreed that if they spoiled the well it should be their loss. Plaintiff consented thereto, and while such officers were using the heavy maul the pipe collapsed. The president was at a directors' meeting at the company's office, near the well, while the 4,000-pound maul was being used, and no objection was made by him. Held, that it was not error to submit to the jury the question whether the original contract was rescinded when a depth of 1,016 feet was reached, and a new arrangement made by the company, through its agents, by which they undertook to complete the well.

4. SAME—MEASURE OF DAMAGES.
     Under such new agreement, if it was made, plaintiff was entitled, for work afterwards done, to whatever such work was worth, and the cost of any materials used, in the absence of any definite contract as to price.

5. SAME.
     In such case, plaintiff was entitled to charge the contract price for the work done up to the time the new contract was made.

6. SAME—RESCISSION—INSTRUCTION.

There was evidence from which the jury might find that while there was no agreement to wholly abandon, in the future prosecution of the work, the original contract, yet that defendant's officers assumed for it the responsibility of driving further than plaintiff thought safe the 10-inch pipe, and that the subsequent collapse of the pipe was entirely due to such officers' action in so doing. *Held,* that it was proper to charge that in case the jury so found, and the collapse of the pipe rendered the performance of the contract impossible, it rescinded the contract.

Error to the Circuit Court of the United States for the District of South Carolina.

This was an action by E. F. Joyce against the Charleston Ice Manufacturing Company to recover an amount claimed to be due him from defendant for drilling an artesian well. There was a verdict and judgment for plaintiff, and defendant brings error. Affirmed.

Samuel Lord, for plaintiff in error.

J. P. K. Bryan, for defendant in error.

Before GOFF, Circuit Judge, and HUGHES and SEYMOUR, District Judges.

SEYMOUR, District Judge. This action was brought by defendant in error to recover the amount due to him from the plaintiff in error for drilling an artesian well. The work done was begun under a written contract containing the following provisions:

"This agreement, made and executed in duplicate, this 19th day of November, 1889, by and between E. F. Joyce, of St. Augustine, Florida, party of the first part, and the Charleston Ice Mfg. Co., of Charleston, S. C., party of the second part, witnesseth: That the said party of the first part, for and in consideration of the compensation hereinafter mentioned, has agreed, and by these presents does agree, to drill in a proper and workmanlike manner, for the said Charleston Ice Mfg. Co., at their works on Market street, Charleston, S. C., a twelve-inch (12-in.) artesian well, one thousand feet (1,000 f.) deep, and to continue this well, with a ten-inch (10-in.) bore, to the depth of three hundred feet (300 f.) further, the whole depth of the well to be thirteen hundred feet (1,300 f.), in such manner as may be necessary, on account of the earth's formation, as will secure, if possible, a ten-inch (10-in.) flow of water from the last (30 f.) thirty feet of water-bearing strata next above a depth of thirteen hundred feet (1,300 f.) below the earth's surface, with the privilege of reducing the size of the well, if necessary, to eight and one-half inches (8½ in.), but to carry a ten-inch hole to the depth of thirteen hundred feet (1,300 f.) if possible, with his machinery, and to case the well, if needed, to a depth of twelve hundred and seventy feet (1,270 f.) with standard wrought-iron drive pipe, and provide it proper steel shoes. The party of the first part to furnish all pipes, shoes, machinery, tools, and labor for said well. The party of the first part further agrees to begin work on said well just as soon as possible, i. e. said party of the first part has to complete two wells with one set of men and rig, and some work with another crew and rig, for the city of Savannah, Ga., all of which work will be pushed to completion as soon as possible, and, immediately after, work will be commenced on the well contracted for by this agreement; and no unnecessary delay shall occur either in beginning or prosecuting work on this well to as rapid a completion as is compatible with safety and success, under a forfeiture of this contract. In consideration for the performance of this agreement the said Charleston Ice Mfg. Company, party of the second part, has agreed, and by these presents does agree, to pay to the said E. F. Joyce or his agent the sum of eight thousand five hundred dollars ($8,500), as follows, viz.: Two thousand dol-

lars ($2,000) when the well is six hundred feet (600 f.) deep; twenty-five hundred dollars ($2,500) when one thousand feet deep (1,000 f.), and four thousand dollars ($4,000) when it is finished."

Under this contract defendant in error bored the well to the depth of 1,016 feet. Commencing with a somewhat larger bore, and carrying a hole 14 inches in diameter to a depth of 379 feet, he sank a well 12 inches in diameter at the bottom to a distance from the surface of 1,016 feet as aforesaid. At this depth the outside diameter of the hole was 12 inches. But, owing to the nature of the soil through which it passed, the necessity arose of casing the well; and through the hole, for its entire distance, was passed a drive pipe of an inside diameter of 10 inches.

The first error which it is material to consider, alleged by plaintiff in error, arises from these facts. Plaintiff in error's second "request to charge" is as follows:

"That the plaintiff cannot recover under the first contract because he did not perform his contract up to the boring and drilling of the well to the depth of 1,016 feet, as alleged in the complaint, but on the contrary had violated it, and himself rendered its performance impossible, by discontinuing the 12-inch pipe at the depth of 380 feet, and defendant is entitled to recover back whatever he has paid under that contract."

The exception taken to this refusal is intended to raise the question of the proper construction of the written contract. The contention is that a "twelve-inch artesian well" means a well which, if cased, shall thereafter have a diameter inside the casing of 12 inches. In refusing to so charge, and leaving the meaning of the words, as illustrated by the evidence, to the jury, we think the judge below committed no error. The words, "a twelve-inch artesian well," are not conclusive of what was the required flow of water through the well, nor does it appear from the contract that the well would need any casing. Whether a 12-inch artesian well is one which has a bore of 12 inches, or one which after being cased has a flow of 12 inches, is a question depending upon evidence. In this case the parties put their own contemporaneous constructions upon the term. The well was driven with the knowledge of plaintiff in error's agents, and under the supervision of its vice president and chief engineer, to the depth mentioned, without any suggestion that the work was not being done in accordance with the contract. Under these circumstances the jury could have put no other construction upon the contract than they did. The objection first taken, as far as appears at the trial, is evidently an afterthought, and comes too late to be worthy of very serious attention.

When the well had reached the depth of 1,016 feet, it was found, as the evidence of defendant in error tends to show, impossible, owing to the conformation of the earth, to drive the 10-inch pipe further without causing it to collapse. C. L. Parker was the agent of Joyce, the contractor and defendant in error, and had charge of the work. The well was situated on the premises of the ice manufacturing company, in Charleston. On the same premises were the offices and place of meeting of the directors of the corporation. On the 3d of July, 1890, the well having reached the depth above

stated, it became impossible to drive the pipe further with the 1,100-pound maul theretofore used. Besides Parker and Joyce's workmen, there were present the resident acting officers of the ice company, Mr. Lapham and Capt. Whitesides. Mr. Hart, the president, was a nonresident, only occasionally coming to Charleston. Lapham was treasurer and manager of the company. Whitesides was president of the company when the contract in litigation was made, and at the time under consideration was its vice president and chief engineer, and especially in charge of the construction of the well. Both were directors, and as Hart, the president, testified, when he (Hart) was absent from Charleston, Mr. Lapham had charge of the affairs of the company. Hart was absent on the 3d of July. Finding that he could not drive the pipe further, Parker proposed to avail himself of his right under the contract to proceed with an 8½-inch pipe, stating his apprehension that any further attempt to drive the 10-inch pipe would cause it to collapse. Mr. Lapham and Capt. Whitesides, for the company, asked permission to use a heavier maul, weighing 4,000 pounds, at their own risk and expense, agreeing that if they spoiled the well it should be at their loss. Witness Parker says that he thereupon went with Lapham and Whitesides into the derrick, and in presence of the workmen told the latter that the ice company had asked permission to drive the 10-inch pipe at its risk and expense, and that he had consented that they might do so under these conditions; that from "now on" the work was at the risk and expense of the ice company, the understanding being that if they spoiled the pipe it was at the expense of the ice company, and not of Mr. Joyce. "I said, 'Now you are working for the ice company.' Mr. Lapham said, 'Yes, the captain is going to drive the pipe.'" Capt. Whitesides then took charge of the work. This testimony was controverted by the evidence introduced in behalf of plaintiff in error. The work was continuous until the 9th of July, when the 10-inch pipe collapsed at a place between 600 and 700 feet below the surface. As afterwards appeared, about 16 feet of the 10-inch pipe was crushed and driven together so as to stop up the well. This pipe was subsequently reamed and man-drilled by Joyce's men until it gave room for an 8-inch pipe, but the ragged inside edges of the 10-inch pipe interfered with the new one. At no time thereafter did the company's agent claim that it was possible to continue the work in accordance with the contract with an 8½-inch pipe, and the only thing attempted was to use an 8-inch one. The endeavor to complete the well was continued with great expense for a considerable time, until the company refused to make the payments demanded by Joyce, and the work was abandoned; the well being, as the company's officers say, perfectly useless. Mr. Hart, the president of the ice company, was in Charleston in July, 1890, at the very time that Whitesides was driving the 10-inch pipe with the 4,000-pound maul, and when the pipe collapsed. He testifies that Lapham informed him that Capt. Whitesides was going to drive the pipe, but he says: "My consent was never asked. I did not consent." It thus appears that he did not object, and that his consent was not considered necessary. A meeting of the direc-

tors of the ice company was held in the office of the company on the 9th, Hart being present. The work of driving the pipe was going on during the holding of the meeting, under Whitesides' direction. Hart himself went and looked at the pipe, saw that it was broken, and asked Whitesides whether the well was spoiled, to which the latter answered that it was not. Not a word, however, was said at the directors' meeting about the well. It must be evident from these facts that whatever was actually done in relation to the contract was or might have been within the knowledge of the president and directors of the ice company, and that the jury had evidence upon which they could find that a new arrangement had been made by the company through its agents, Whitesides and Lapham. The first exception to the charge cannot, therefore, be sustained. It is as follows:

" 'The vital questions in this case begin right here,—24th of June, 1890. When Capt. Whitesides undertook to drive the pipe, did he do this under and in consequence of an arrangement whereby he, in behalf of the company, and by authority of the company, undertook the completion of the well, and rescinded the contract theretofore existing? Did this contract end this day, with the concurrence of both parties, and did each of them so understand? The solution of this question depends entirely upon the credibility you give to the testimony of the witness.' To which charge the defendant then and there, and before the jury had withdrawn from the bar, did except, and prayed the court to sign and seal said exception, which was accordingly done."

The plaintiff in error excepts to the following instructions of the court:

"If you come to the conclusion that Capt. Whitesides is responsible for the collapse or the telescoping of the pipe, then the next question is, did this accident render the performance of the contract impossible? If it did, and if Capt. Whitesides caused it, then this rescinded the contract. If it was possible to finish the contract, notwithstanding the accident, then the contract was not rescinded, the plaintiff was still bound to perform it, and the defendant only became liable for the expenses made necessary to repair the damage.

"If plaintiff was in no fault at all, and if defendant broke this contract, and Whitesides, by authority, rescinded and consented to abandon it, plaintiff is entitled to what his work was worth, less the sums already paid him on his account. For all work done while the contract was still executory,—that is, in force and not completed,—he could charge the contract price. For all work done when the contract was at an end, he can get what it was worth, and the cost of the pipe furnished by him,—the actual cost,—and the loss of his profit. Of this last you must decide from the testimony, recollecting that the profit diminished as the well deepened."

Two theories were presented to the consideration of the jury by these instructions. The latter, in the order in which they were given, was contingent upon the jury finding from the evidence that the parties mutually agreed to abandon the original contract when the boring had reached the depth of 1,016 feet and agreed that the work should be continued at the expense of the ice company, without any definite bargain as to price. It is evident that in such case, as the learned judge correctly charged, the contractor would be entitled, for such prospective work, to what that work might be worth, and what the materials might cost him. As the exception taken is to the entire instructions, we need not consider whether he was further entitled to charge anything for loss of profit. We are also of

the opinion that he was entitled to charge the contract price in such case for the work already completed. Such must have been the intention of both parties, there being no evidence to the contrary, and nothing to show that any new arrangement was contemplated with regard to the price of the work already done. That was provided for by the original contract, which was not affected by the new one, except with respect to the unfinished part of the work. The words, "if Whitesides, by authority, rescinded and consented to abandon" the contract, were intended by the judge, and must have been understood by the jury, to refer to its unfulfilled provisions.

But there was another view of the case arising upon the evidence. The jury might find from the evidence that while there was no agreement to wholly abandon, in the future prosecution of the work, the original contract, yet that Capt. Whitesides assumed for the company the responsibility of driving, further than Parker thought safe, the 10-inch pipe, and that the subsequent collapse of the pipe was entirely due to his action in so doing. In such case the judge instructed the jury that if the collapse of the pipe rendered the performance of the contract impossible this rescinded the contract. To this proposition of law plaintiff in error excepted upon the ground that the party in fault cannot by his own action rescind a contract. This is undoubtedly true. Where one party to a contract renders its performance impossible, he has not the right to rescind it without the consent of the injured party, for he cannot be allowed to so deprive the other party of its benefits. But it is for the benefit of the party injured that the contract is kept alive. The injured party has his action for the breach of the contract. As the learned judge who tried this case explains in his elaborate opinion refusing a new trial, to the extent that the company's action rendered the performance of the contract impossible, the company committed a breach of the contract, and for the purposes of a suit founded on this breach the contract is treated as subsisting. In this case there can be no doubt but that up to the time that the well had been driven to the depth of a thousand feet the work had been done in accordance with the contract, and there is no reason why the plaintiff below should be deprived of what he had actually earned, by the fault or error of the other party. He is not seeking to recover for work which he had been prevented from performing, but for work actually done, and done under the contract. There is no reason for applying to this case the rule that one cannot sue under a contract which has been rescinded, but must sue for the value of the work done; and it can make no difference whether the suit on the first ground of action is for the amount due on the contract, or for work and labor done, to be measured by the contract rate. Butterfield v. Bryon, 153 Mass. 517, 27 N. E. 667. In U. S. v. Behan, 110 U. S. 346, 4 Sup. Ct. 81, Mr. Justice Bradley says:

"It is to be observed that when it is said in some of the books that when one party puts an end to the contract the other party cannot sue on the contract, but must sue for the work actually done under it as upon a quantum meruit, this only means that he cannot sue the party in default upon the stipulations contained in the contract, for he himself has been prevented from performing his own part of the contract upon which the stipulations depend.

The distinction between those claims under a contract which result from a performance of it on the part of a claimant, and those under it which result from his being prevented by the other party in performing it, has not always been attended to."

The instruction of the learned judge of the circuit court was not intended to bear the construction that the contract was rescinded, in the sense that it was set aside and annulled as if nonexistent, but that it was rescinded in so far as its performance was impossible. In that part of the charge which speaks of the contract as rescinded by the conduct of the ice company's agent, the jury received no instructions as to the measure of the recovery for the work completed before such agents took control of the work on the well, and no exception is taken to this omission. It seems to be assumed by counsel that the next ensuing instruction, which did cover this point, was also applied to the clause in the charge preceding it. What seems to us a matter of some doubt in the case, whether the contract does really give a measure by which to ascertain the amount due on the work done on the first thousand feet of the well, is not raised by the exceptions taken. This point we do not decide. But we are satisfied that in this respect plaintiff in error has no reason to complain of the verdict. By it, as it stands, he is to pay only $4,500 for his work. That is the amount which was to be absolutely paid upon the completion of this part of the well. As a rule, contractors are never paid more than a proportionate share of their compensation as their work proceeds. Usually they receive less, something being held back to insure the completion of the contract. Either $4,500 was to be paid under the contract for the first two installments of the work, in full payment for it, thereby measuring what the contractor was entitled to recover for it, whether suing on the contract or on a quantum meruit, or else he was entitled to a larger sum for his services, which is recoverable by an action for labor and materials.

The questions arising in the pleading, we consider as settled below. The court is of opinion that there is no error, and the judgment of the circuit court will be affirmed, with costs.