VIRGINIA SHIPBUILDING CORPORATION v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION, et al.

UNITED STATES v. VIRGINIA SHIPBUILDING CORPORATION et al.

(District Court, E. D. Virginia, at Alexandria. January 11, 1923.)

1. Shipping ☞24—Contract held one of sale of ships.

The Virginia Shipbuilding Company was in default under a contract for construction of certain ships for the Fleet Corporation and largely indebted for advances when a supplementary contract was made by the parties for the purpose of settlement and adjustment of affairs between them, by which the Virginia Company agreed to buy the ships, on terms fully stated, making an initial payment on each as completed, with a lien reserved for the remainder of the agreed purchase price, which exceeded the building contract price. Held, that the contract was not an executory agreement to make a sale, but one of sale, binding on the parties, and under which the right and title to the ships became vested in the purchaser, subject only to payment of the purchase price.

2. Compromise and settlement ☞17(1)—Rule as to conclusiveness stated.

An agreement of compromise and settlement of differences between the parties is favored by the courts, and if fairly made is as conclusive on the parties as a judgment.

3. Compromise and settlement ☞23(3)—Agreement may be impeached only by clear and unequivocal testimony.

A party attacking the validity of a contract of compromise and settlement has the burden of proving the charges made by clear and unequivocal testimony.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 44 Sup. Ct. 38, 68 L. Ed. —.

4. **Sales** ⟨key⟩94—**Contract held not abrogated by later modification.**
A contract of sale is not abrogated by a subsequent modification, which keeps alive the right of the purchaser, on performance by him, to compel delivery of the property by the seller.

5. **Sales** ⟨key⟩177—**Contract may not be avoided because of depreciation of market value of property.**
The fact that the market value of property which was the subject-matter of a sale largely depreciated before the time for delivery does not give the purchaser any equity to impose the loss on the seller.

6. **Estoppel** ⟨key⟩3(1)—**Party cannot take inconsistent positions in litigation.**
A complainant cannot, in the course of the litigation, change its position by claiming rights inconsistent with the allegations of its pleadings, to the detriment of the other party.

In Equity. Suits by the Virginia Shipbuilding Corporation against the United States Shipping Board Emergency Fleet Corporation and another, and by the United States against the Virginia Shipbuilding Corporation and others. Basis for accounting between the parties determined.

Barber & Gibboney, of New York City, Day, Day & Wilkin, of Cleveland, Ohio, James R. Caton, of Alexandria, Va., Rockwood & Lark, of New York City, Wilton J. Lambert, of Washington, D. C., Harry K. Wolcott, of Norfolk, Va., J. K. M. Norton, of Alexandria, Va., Carlin, Carlin & Hall, of Washington, D. C., and Edward E. Blodgett, of Boston, Mass., for Virginia Shipbuilding Corporation and those claiming interest therein.

Paul W. Kear, U. S. Atty., of Norfolk, Va., Chauncey G. Parker and Edgar T. Brackett, both of Washington, D. C., Fletcher Dobyns, of Chicago, Ill., and Geoffrey Goldsmith and Edward M. Allison, Jr., both of Washington, D. C., for United States Shipping Board Emergency Fleet Corporation, United States Shipping Board, and United States.

WADDILL, Circuit Judge. The object of each of these suits is to have an accounting between the Virginia Shipbuilding Corporation, on the one hand, and the United States Shipping Board Emergency Fleet Corporation and others, on the other, growing out of certain contracts entered into between the parties, hereinafter specifically set forth, whereby the Virginia Company bound itself to construct for the Fleet Corporation, at its shipyard in Alexandria, Va., 12 steel ships, of 9,400 tons dead weight carrying capacity each, 11 knots speed at deep-load draft, for the lump sum purchase price of $1,504,000 for each of said vessels when completed. The specific matter submitted to the court is the determination of the basis upon which such accounts should be made, to the end that it may by its decree instruct the master as to what shall be embraced in the accounting and the rights and liabilities of the parties thereunder.

The United States of America, in the action brought by it, takes the position that it is a mortgagee in possession of the ships, the Virginia Company and its assignees and transferees being only owners of the equity of redemption therein; also, that it has a right in equity to have

reinstated a lien upon the plant of the Virginia Company theretofore released, and it seeks to have the accounting proceed on that basis. The Virginia Company insists that the United States is the owner by absolute title of the vessels in question, and has no lien or right of lien upon the plant, but is indebted to the Virginia Company for a portion of the contract price for constructing the vessels, and seeks to have the accounting so made. It is only fair to say in this connection that the position of the Virginia Company at this time is not in conformity with the averments of the bill and amended bill and pleadings in the first-named cause instituted by it, and that certainly, so far as the claim of ownership and title to the ships is concerned, the parties in the pleadings seem to be in substantial accord.

The first and most important question to be ascertained is the ownership of the vessels, to the end that it may be determined upon what theory the accounting may be had and settled. The necessity of determining this ownership was early recognized on every hand, and hence the contracts, as well the three directly involved, as several incidentally bearing on the issue, were introduced, along with much oral and documentary evidence, showing the circumstances under which the same were severally entered into, with a view of throwing light upon the undertakings and intent of the parties, and of the meaning of the several contracts, so far as the same may not be clear and free from ambiguity. The substance and effect of the three main contracts involved are, namely: (a) That of December 1, 1917, under which the contract to build the 12 ships was first undertaken; (b) that of September 25, 1919, known as the "adjustment agreement"; and (c) that of July 19, 1920, supplemental to the other two. References to these three contracts will be as brief as possible, though an understanding of them will require some elaboration, as there are many questions involved in their interpretation that are not free from doubt, and the views of the respective parties in interest have been presented fully, both orally and in writing, by counsel of eminence and unusual ability.

FIRST. Construction Contract, December 1, 1917, Known as "Contract 145 S. C."

By this contract the Virginia Company, as assignee of the Groton Iron Works, undertook to construct for the government the 12 steel ships before referred to. They were to be of 9,400 tons dead weight carrying capacity, 11 knots at deep-load draft, to be constructed under the rules and regulations of the American Bureau of Shipping or Lloyds, and of the Moore & Scott type. Three ships were to be delivered at 10, 11, and 12 months, respectively, from the date of the contract, two each at 13, 14, and 15 months, respectively, and the remaining three within 16 months from the date of the contract. The contract provided for the payment of a lump sum of $1,504,000 for each of such completed vessels, and entered into much detail as to the terms and time of payment, namely, that $210,000 was to be paid for steel material for the construction of each ship when ordered by the contract or, 10 per cent. of the contract price within 30 days after the signing of the contract, and the residue during construction, as the work progressed, as therein specified. The contract further provided

for possible changes in the cost of construction, alterations, delays, insurance, forfeitures, title to the ships, settlement of disputes, etc.

The contract also provided for the construction, equipment, and maintenance at Alexandria by the contractor, at its cost, of a suitable and complete shipbuilding plant, with all necessary buildings, offices, shops, slips, and housing facilities for employés, adequate for the construction, completion, and delivery of the vessels within the time specified, such plant to be substantially completed within 200 days. It was agreed that title to the vessels completed or under construction, upon proper inspection, should be in the United States of America, and also the title to all material, that time was of the essence of the contract, that no other work was to be accepted which would interfere with that of the government, and that a bonus of $300 a day would be paid by the government for delivery of ships in advance of the time for completion specified in the contract, and a like charge loss for each day of delay after such date, such bonus and loss, however, not to exceed the sum of $25,000 in the case of any one ship.

Much delay ensued, as well in the matter of construction of ships as in the completion of the yard, with the result that not a single vessel was completed until long after the expiration of the time designated, nor was the shipyard completed in the specified time, although the government loaned to the contractor under the contract of May 15, 1918, called "Supplemental Contract S. C. 145," the sum of $750,000 secured by mortgage upon the shipyard, to facilitate its completion, and at a later date, to wit, 10th of January, 1919, loaned the contractor on second mortgage, for like purposes, a further sum of $394,182.22.

SECOND. The "Adjustment Agreement" of September 25, 1919. Entitled "To Attach to Contract 145 S. C.," Made Pursuant to the Preliminary Agreement of September 15, 1919.

This agreement recited, among other things, that the Virginia Company, being the owner of the shipyard at Alexandria, Va., was engaged in constructing vessels for the Fleet Corporation under contract dated December 7, 1917, known as "Contract 145 S. C." said vessels being hulls 1 to 12, inclusive; that hulls 1, 2, and 3, namely, the "Gunston Hall," the "Betsy Bell," and the "Vanada," had theretofore been completed and delivered to the Fleet Corporation; that hulls Nos. 11 and 12, had been canceled at an agreed compensation to the contractor of $800,000, the amount to be credited upon the Virginia Company's obligations to the Fleet Corporation, thus leaving for construction only hulls 4 to 10, inclusive; that advances had been made, subject to audit and confirmation by the Fleet Corporation, for yard and ship construction, of approximately $12,000,000, in addition to approximately $1,000,000 advanced under the two mortgages (on the plant) referred to of 15th of May, 1918, and 10th of January, 1919. The contract further recited that certain differences had arisen between the parties, and they had entered into an agreement in reference thereto, as appears by the following quotations therefrom:

Whereas, various differences of opinion have arisen between the company and the Fleet Corporation with respect to their respective rights, duties, and obligations, more particularly as to the amounts due for pro-

gress payments accruing under contract 145 S. C., for excess wages under Macy. award for 'extras,' and as just compensation for cancellation of order for hulls 11 and 12, Virginia yard, and the parties hereto are desirous of settling and adjusting all outstanding matters between them, in pursuance of which proposed settlement the company offers to purchase from the Shipping Board the ships already constructed and a sufficient number of those still to be constructed to work out and pay off the indebtedness of the company to the Fleet Corporation account of all advances made or to be made by the Fleet Corporation to the company, and the company has deposited with the United States Shipping Board, in consequence of such proposal, and the provisions of the preliminary agreement between the parties under date of September 15, 1919, the sum of $450,000 to apply on the purchase price of the ship Vanada (hull No. 3): It is understood and agreed as follows:

## Article I. Compensation for Cancellation.

The Fleet Corporation agrees to allow and the company to accept the sum of eight hundred thousand dollars ($800,000) as just compensation for the cancellation of the order for hulls Nos. 11 and 12 by the Fleet Corporation, credit therefor to be made as hereinafter provided.

## Article II. Sales.

It is agreed that the purchase price of all vessels to be sold under this article shall be computed on the dead weight tonnage of each vessel, which. is 9,400 tons, which figure is accepted by both parties as final, conclusive, and binding as to the tonnage in respect to which the purchase prices herein pro-. vided for are to be computed, and any variation from said figures of dead weight tonnage which may appear by actual measurement or otherwise shall not affect the amount of the purchase prices. hereinafter to be determined.' This provision shall not be considered as a waiver by the Fleet Corporation of its right to require the company to complete the vessel as per specifications and drawings provided in contract 145 S. C.

(a) The company agrees to purchase from the Shipping Board, and the Shipping Board to sell to the company, the ship Vanada, hull No. 3, and to pay therefor the sum of $2,115,000, less a credit of $100,000, account of claim. based on the cancellation of hulls Nos. 11 and 12, Virginia yard. The sale of this ship to be under the terms of the present standard form of purchase agreement and mortgage adopted by the Shipping Board, copy of which is. attached hereto and made a part hereof, at a price of $225 per D. W. T., the initial 25 per cent. cash payment thereunder to be credited with the sum of. $450,000 heretofore deposited by the company with the Shipping Board.

(b) The company further agrees to purchase from the Shipping Board, and the Shipping Board to sell to the company, the two ships Gunston Hall and Betsy Bell, hulls Nos. 1 and 2, subject to the existing commitments, if any, as soon as the same can be delivered, except that such sale shall be treated as having been made at the time the ships left the yard, and the company shall be credited on the initial payment therefor with a sum equal to the earnings of the ships, and charged with a sum equal to all expenses, and shall be responsible for all obligations and liabilities of or on account of said vessels, arising between the date of their delivery from the yard and their delivery to the company under this agreement. The company is to pay for these two ships at the rate of $225 per D. W. T., less a credit of $100,000 on each ship, account of claim based on the cancellation of hulls 11 and 12, Virginia yard, and the credit on the initial payment hereinbefore provided for. The terms of this sale shall be the same as under the present standard form of purchase agreement and mortgage adopted by the Shipping Board.

(c) The company further agrees to purchase from the Shipping Board, and the Shipping Board to sell to the company, upon completion, five (5) of the remaining ships now under construction, and such additional ships as may be hereinafter provided for. The price of the ships purchased under this sec-. tion shall be at the rate of $225 per D. W. T., less credit on each ship, up to

and including five ships, of $100,000, account of claim based on the cancellation of hulls Nos. 11 and 12, Virginia yard. Should additional sales be made, no credit shall be allowed account of said cancellation. The terms of sales made under this section shall be the same as under the present standard form of purchase agreement and mortgage adopted by the Shipping Board.

## Article III. Cancellation of Advances.

Upon the sale of each ship the Fleet Corporation agrees that the debt of the company to the Fleet Corporation on account of advances, expenses, and charges of the Fleet Corporation shall be reduced by an amount equal to the sum of the initial payment and the principal amount of the mortgage given for the deferred payments thereon.

## Article IV. Mortgages.

The mortgages given as security for deferred payments on ships under the foregoing article shall be individual mortgages on each ship, and the company shall have the right to pay off any and all mortgages, in whole or in part, at any earlier date than that provided for therein.

The existing mortgages on the company's plant and securities held by the Fleet Corporation, as security for advances, shall remain in force until the final adjustment and exchange of releases hereinafter provided for.

## Article V. Initial Payments.

The Fleet Corporation agrees to make additional advances as required for pay rolls and other necessary yard costs through a controlled account as under the present arrangement up to a maximum not exceeding amount of said initial payments, interest on such additional advances to commence at the respective dates when they are made: Provided, however, that the amount of said additional advances at any given time shall not exceed the amount of the initial payments on ships theretofore made under this contract, including the net earnings from the Gunston Hall and Betsy Bell, credited against the initial payments on these ships: And provided, further, that the funds so advanced shall not be used on account of construction of vessels other than those covered by the original contract.

If the amount equal to the initial payments arising from the sale of ships is not sufficient to carry on the work of construction until the completion of the eighth ship, or such additional ship or ships as may be necessary to work out the indebtedness of the company in the manner provided for herein, the company agrees to furnish such additional cash as is necessary.

If an amount equal to the proceeds of the sale of the eight ships is not sufficient to provide for the payment in the manner provided of the total indebtedness of the company to the Fleet Corporation, with interest, the company agrees to purchase such additional ship or ships as may be necessary to provide for such payment, or, in the alternative, shall furnish other satisfactory security or payments.

## Article VI. Advances.

Under the provisions of this agreement advances by the Fleet Corporation shall include:

All advances heretofore made by the Fleet Corporation for yard and ship construction, including progress payments, made under contract 145 S. C. and supplemental contract 145 S. C.

All advances to be made under this agreement.

A proper part of the Fleet Corporation's overhead, such as naval architects' and inspection fees, accounting, auditing, supervision, insurance, plant protection, and similar items, to be determined by the Fleet Corporation, the total overhead not to exceed $60,000 for each ship. The adjustment of the account in relation to this item shall be deferred until the delivery of the last ship.

All obligations incurred by the Fleet Corporation, pursuant to this present contract or contract 145 S. C., shall be equivalent to advances.

All advances or other expenditures by the Fleet Corporation shall bear interest at the rate of 5 per cent. per annum, computed upon the amounts advanced or expended, from the date of the advances or expenditure thereof by the Fleet Corporation.

## Article VII.   Final Adjustment.

Upon the delivery of the eighth ship, or such number of ships as may be necessary to work out the indebtedness of the company to the Fleet Corporation for advances as herein defined, there shall be a final adjustment, which adjustment shall be such as to reimburse the Fleet Corporation, in the manner provided for herein, for all moneys advanced and other expenses incurred and its other charges in connection with the construction of the Virginia yard, or the construction of ships therein, including overhead as limited above, with interest at the rate of 5 per cent. per annum.

Upon such adjustment, if the unpaid advances, expenses, and charges of the Fleet Corporation have been fully provided for in the manner specified in article III of this contract, or otherwise paid or secured in a manner satisfactory to the Fleet Corporation and the Shipping Board:

(a) Then the Fleet Corporation shall release the mortgages on the company's plant, and any other security which it now holds, for said advances (except the mortgages on ships herein provided for); and

(b) The Fleet Corporation shall deliver to the company a bill of sale, conveying to the company all plant and ship materials, and uncompleted ships, remaining in the yard; and

(c) The company, on the one hand, and the Fleet Corporation and the Shipping Board, on the other hand, shall exchange full releases, which shall leave the company and the Fleet Corporation and Shipping Board released and discharged from any and all claims, of any character whatsoever, which any party hereto may or might have against the other or others in respect to the matters covered by this agreement, or contract 145 S. C. and supplemental contract 145 S. C., except as to the obligations created by the standard purchase agreement and mortgage to be given with each sale provided for herein.

It is expressly agreed that the company shall not become obligated to pay more than the total amount advanced or loaned by the Fleet Corporation, including interest and overhead as herein provided, and that the last mortgage given shall be adjusted accordingly, so that it shall not exceed the amount of said indebtedness not then repaid to the Fleet Corporation by previous payments and mortgages on ships.

## Article VIII.   Former Contracts.

It is expressly agreed that the contracts now in existence (contract 145 S. C. and supplemental contract 145 S. C.) between the company and the Fleet Corporation shall remain in full force and effect, except in so far as any provisions thereof are in conflict with this agreement.

## Article IX.   Forfeiture.

In case of any failure by the company at any stage of the program herein provided for, prior to final adjustment, to fulfill the obligations of this agreement, then the Fleet Corporation may declare the contract forfeited and the original contracts reinstated in full force and effect, in so far as they relate to the ships not then sold to the company hereunder:

Provided, that prior to declaring such forfeiture the Fleet Corporation shall give fifteen days' written notice to the company, as to the matter in which the Fleet Corporation claims the company to be in default, and if within said fifteen days said default is cured to the satisfaction of the Fleet Corporation no forfeiture shall be declared.

Such forfeiture shall not in any way affect or rescind any sale of ships to the company which may have been actually made nor the efficacy of any payments and/or mortgages under such sales as reductions of the amount due for the advances, expenses, and charges of the Fleet Corporation to the com-

pany for the construction of yards and ships. Further, such forfeiture shall be considered as having released the Fleet Corporation from any obligations to make further progress or other payments for any and all ships previously delivered to the Fleet Corporation and sold to the company, including claims for excess wages due to Macy award, "extras," and every other claim of any nature whatsoever in respect to those ships.

All unpaid advances of the Fleet Corporation to the company existing at the time of such forfeiture shall be, on the reinstatement of the former contracts, considered as offsets against claims by the company for progress payments on the ships delivered to the Fleet Corporation, but not at that time sold to the company, and the ships remaining under construction.

Forfeiture under this agreement shall release the Fleet Corporation from the obligation of allowing any further amounts on account of claim for just compensation for the cancellation of the order for hulls Nos. 11 and 12.

### Article X. Release.

The company hereby specifically releases the Fleet Corporation, the United States Shipping Board, and the United States of America of and from any and all claims, demands, and/or liability of every sort and nature whatsoever which it has or might have against either or all, arising out of, either directly or indirectly, or in connection with, contract 145 S. C., and supplemental contract 145 S. C., up to the date of this agreement, and in particular all claims against the Fleet Corporation for progress payments under contract 145 S. C., extras, excess wages due to the Macy award, and every other claim of any nature whatsoever, except as to the obligations which under this agreement are to be performed by the Fleet Corporation and the shipping Board, but in the event this contract shall be declared forfeited this release shall be rendered void, except as above provided in article IX.

It will be observed that, at the time of the execution of this contract, but three of the ships had been completed, and the arrangement to cancel hulls 11 and 12 consummated, leaving seven vessels, hulls 4 to 10, inclusive, to be built. Of this number, four were completed and delivered, namely, the H. F. Morse on the 23rd of October, 1919, the E. A. Morse on the 7th of January, 1920, the J. R. Morse on the 12th of March, 1920, and the C. C. Morse on the 15th of April, 1920, which left uncompleted at the time of the entry into of the next recited contract of July 19, 1920, three hulls, namely, hulls 8, 9, and 10, hull 8 being the A. E. Morse and hull 9 being the C. H. Livingston, which were completed and delivered on the 1st of November, 1920; hull No. 10 never having been completed.

THIRD. Contract of July 19, 1920, Attached to Contract 145 S. C.

This is an agreement between the Virginia Company and the United States Shipping Board Emergency Fleet Corporation and the United States Shipping Board, the two last named representing the United States of America, and recites:

"Whereas, the parties hereto entered into a certain adjustment agreement, supplemental to contract 145 S. C., under date of September 25, 1919, which said adjustment agreement provided for the company taking over contract 145 S. C. and completing and purchasing sufficient of the vessels constructed and being constructed thereunder to liquidate the indebtedness of the said company to the Fleet Corporation, as provided for in the said contract of September 25, 1919."

It also recited that, of the three vessels remaining undelivered, hull No. 8 would be completed within approximately 15 days, and hulls 9 and 10 were approximately 75 and 50 per cent. completed; that the Shipping

Board had reconveyed to the Virginia Company hulls 3 and 4, the Vanada and the H. F. Morse; and that the Virginia Company had requested the Fleet Corporation to release two deeds of trust from the Virginia Company to Samuel G. Brent and Gardner L. Boothe, trustees, dated 15th of May, 1918, and 10th of January, 1920, to secure certain loans made by the Fleet Corporation, and to substitute in lieu thereof a mortgage to secure $2,000,000 of bonds, to enable the Virginia Company to complete its contract of 25th of September, 1919, and for other purposes therein mentioned, as specifically set forth in clauses 2, 3, 6, 7, and 8 of said contract, and after providing for the release of the said two liens upon the plant, and for placing the new lien of $2,000,000, and especially the guaranty by the Virginia Company of the fulfillment of the Groton Iron Works contract with the Fleet Corporation, as set forth in said sections 2, 3, 6, 7, and 8. Sections 1, 4, and 5 provided that the Virginia Company should, within 30 days from the date thereof, reconvey to the Shipping Board hulls 3 and 4, and its title to hulls 1, 2, 5, 6, 7, 8, 9, and 10 were also to be transferred and conveyed to the United States of America, and that on and after the completion of the present voyages of vessels 1 to 7, inclusive, namely, the Vanada, the Gunston Hall, the Betsy Bell, the H. F. Morse, the E. A. Morse, the Coleman C. Morse, and the Jennie R. Morse, said Virginia Company should account for or cause to be accounted for the revenues of said vessels in the manner provided in the form of agency agreement for the operation and management of vessels of the Fleet Corporation, and that the same procedure should be followed as to all vessels thereafter delivered to the Virginia Company, under the terms of that agreement, and under the terms of the agreement of September 25, 1919. But it was expressly agreed that the company might use the net operating revenues from the operation of hulls 1 to 7, and those thereafter to be delivered, for the purpose of financing the construction of hulls 8 to 10, inclusive, then under construction at the Virginia Company's yard, said funds to be disbursed by the treasurer of the Fleet Corporation.

The fourth clause of the contract is as follows:

"(4) That upon the completion of hulls 8, 9, and 10, and the final statement of account between the Fleet Corporation, the company, and the Groton Iron Works, the company hereby consents to the Shipping Board transferring the company's equity in hulls 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 to a corporation nominated by the company in accordance with the directions of the United States Shipping Board, title to said vessels to be deemed effective as of the original dates of delivery thereof to the company, which said corporation shall be limited to the operation of said vessels, and that said corporation shall enter into a contract with the Shipping Board for the payment of the amounts outstanding on the purchase price of said vessels, said contract to be in accordance with such standard policy and terms as shall be adopted by the Shipping Board for the sale of steel vessels."

And the concluding part of subsection (e) of section 9, is as follows:

"That upon the happening of any act of default, or in the event the company shall default in any of the terms of the contract 145 S. C., as modified by contract of September 25, 1919, or of this agreement, the Fleet Corporation shall have the right to enter the yard of the company, and to complete the vessels remaining under construction in such manner as it may deem to its

best advantage, and may retain title to so many of the said vessels and to so much of said surplus material in the yard of the company as may be necessary to offset the total indebtedness of the company to the Fleet Corporation, including all the obligations of the company to the Fleet Corporation under said contract of September 25, 1919, and under this contract."

Sections 10 and 11 authorized the Virginia Company to dispose of all surplus material not required to complete the construction of said hulls, and to apply the proceeds from such hulls to the obligations arising under the article then in recital and the contract of the 25th of September, 1919. Paragraph 11 also provided that that contract should be supplemental to contract 145 S. C. and supplemental to the contract of September 25, 1919, and its provisions should govern in case of dispute.

The provisions of the contracts involved are set forth with some detail, as it is only from a careful review of them, and the relation they bear one to the other, that they can be correctly interpreted, and the rights of the parties ascertained. At the threshold it becomes apparent that upon entering into the adjustment agreement of the 25th of September, 1919, having for its purpose the "settling and adjusting of all outstanding matters" between the parties, the respective rights and status became different from those theretofore existing under the original agreement of the 7th of December, 1917, providing for the construction of the ships. In the carrying out of this large contract, differences arose between the parties thereto which made changes necessary. The adjustment agreement of September 25, 1919, recited that the Fleet Corporation had advanced and loaned to the Virginia Company, for yard and ship construction, approximately $12,000,000, and held a mortgage on the plant and other securities of the company for from $750,000 to $1,000,000, and various differences having arisen between the parties with respect to their rights, duties, and obligations, and as to the amounts due to the Virginia Company, growing out of sundry transactions set forth in the agreement, and the parties being desirous of settling and adjusting all outstanding matters between them, the Virginia Company offered to purchase from the Shipping Board, the ships already constructed, and a sufficient number of those to be constructed, to work out and pay off the indebtedness to the Fleet Corporation, of all advances made, or to be made, by the Fleet Corporation to the Virginia Company, it thereupon deposited with the Shipping Board $450,000, the cash payment on the purchase price of the Vanada, and a like sum was to be paid in cash on each ship, and the terms and method of securing the deferred payments regularly agreed upon. In concluding this transaction, the significant language used was that "the company agreed to purchase from the Shipping Board to sell to the company" the ships in question. The utmost detail was gone into as to how the payments should be made, what items should be accepted as credits in the transaction, together with the manner and method of securing deferred payments, how and when the ships should be delivered, and for the final closing of the transactions upon the extinguishment of the indebtedness due to the Shipping Board.

From the entry into this adjustment agreement the entire dealings between the parties were upon a new basis, and no longer upon that of

contractor and contractee under the original contract. The ships as completed were used, operated, and controlled by the Virginia Company or its assignees, with a view of earning money with which to complete payments on them. The execution of formal papers of transfer, and the giving of mortgages upon the vessels, was actually concluded as to only two of the ships; the delay as to the others being doubtless caused by the necessity to raise the large cash payments on each ship, and the consummation of the final negotiations and execution of the mortgages to secure the deferred payments.

[1] Counsel for the Virginia Company and its assignees insist that, notwithstanding the plain and unambiguous language used, indicating the making of a sale of the ships in question, in point of fact a sale was not contemplated, or at least was not made, and that the undertaking between the parties was but an executory agreement to make a sale, as distinguished from a sale in the case of an executed contract. Authority is cited to sustain this view. Elgee Cotton Cases, 22 Wall. 187, 22 L. Ed. 863; Hatch v. Oil Co., 100 U. S. 130, 25 L. Ed. 554; United States v. Peck, 102 U. S. 64, 26 L. Ed. 46; Harkness v. Russell, 118 U. S. 663, 668, 7 Sup. Ct. 51, 30 L. Ed. 285; United States v. United Engineering Co., 234 U. S. 236, 34 Sup. Ct. 843, 58 L. Ed. 1294; Hammer v. United States, 249 Fed. 336, 337, 161 C. C. A. 344; Williston on Sales, vol. 2, p. 1305; Dubois v. D. & H. Canal Co., 4 Wend. (N. Y.) 285; Powers v. Hogan, 6 N. Y. St. Rep. 239, 240; Mansfield v. N. Y. C. & Co., 102 N. Y. 205, 211, 6 N. E. 386; Moore v. Curry, 112 Mass. 13; Lewis v. Morgan, 14 La. Ann. 401; White v. Wood, 15 Ala. 358, 359.

A careful review of these citations will not, in the judgment of the court, under the facts and circumstances of this case, warrant the claim contended for. On the contrary, the great weight of authority, if not all of the controlling decisions, will sustain the government's view that the undertaking, as entered into between the parties here, no longer remained in the class of a mere executory agreement, but it became a final and binding sale, passing the right and title to the property involved from one to the other; that the same had been performed by the seller, and breached by the buyer; that there was nothing for the seller of the property to do but to carry out the terms and conditions of the sale, and deliver the property, where it had not already done so, to the buyer, upon the latter's complying with the terms of sale by paying for the same, and executing the documents necessary to secure the deferred payments; that the right and title to the property belonged to and became vested in the purchaser, subject only to the payment of the purchase price, and the extinguishment of the unpaid purchase-money lien thereon. Only a few of the many authorities that might be cited to sustain the court's views, need be given. Gilbert & Secor v. United States, 8 Wall. 358, 19 L. Ed. 303; Boffinger v. Tuyes, 120 U. S. 198, 7 Sup. Ct. 529, 30 L. Ed. 649; Hennessy v. Bacon, 137 U. S. 78, 83, 11 Sup. Ct. 17, 34 L. Ed. 605; International Contracting Co. v. Lamont, 155 U. S. 303, 308, 15 Sup. Ct. 97, 39 L. Ed. 160; Chicago, M. & St. P. Ry. Co. v. Clark, 178 U. S. 353, 20 Sup. Ct. 924, 44 L. Ed. 1099; Bierce, L'd., v. Hutchins, 205 U. S. 340, 27 Sup. Ct.

524, 51 L. Ed. 828; Charleston Ice Mfg. Co. v. Joyce, 63 Fed. 916, 11 C. C. A. 496; Housekeeper Pub. Co. v. Swift, 97 Fed. 290, 38 C. C. A. 187; Grand Trunk West. Ry. Co. v. Chicago & E. I. R. Co., 141 Fed. 785, 73 C. C. A. 43; McCabe Const. Co. v. Utah Const. Co. (D. C.) 199 Fed. 976; Hughes v. Brennan Construction Co., 24 App. D. C. 90; Cutter v. Cochrane, 116 Mass. 408, 410; Tuttle v. Metz Co., 229 Mass. 272, 275, 118 N. E. 291; Williston on Contracts, § 1826, and cases cited in footnote 29. Treating the contract in question, not as one of actual sale, but merely an executory contract of sale, the following authority bearing upon its effect in equity may be cited: Pom. Eq. Jur. (4th Ed.) §§ 368, 369, 370, 372, and 373, and especially notes 1 and 2 to section 368, and note 1 and "A" to section 373.

[2] Not only were the reciprocal rights and obligations of the parties upon the execution of the adjustment agreement of September 25, 1919, entirely changed, but the agreement should be considered and viewed in the light of such altered conditions, arising from the undertaking, and of the conceded purpose of the parties affected to adjust, compromise, and settle their differences. When so considered, the same should be liberally construed, as tending to effect such settlement. Judge Sanborn, speaking for the Circuit Court of Appeals for the Eighth Circuit, in Chicago & N. W. Ry. Co. v. Wilcox, 116 Fed. 913, 914, 54 C. C. A. 147, 148, aptly said:

"The policy of the law has always been to promote and sustain the compromise and settlement of disputed claims. It loves peace, hates broils and dissensions, and discourages the prolongation of litigation and the revival of controversies which have once been closed. The judgment of a court settles the claims submitted to it, and estops the parties from again litigating them after they have been adjudicated. In the absence of fraud or mistake, an executed agreement of settlement of an unliquidated or disputed claim constitutes as conclusive and as effectual an estoppel against the parties to the compromise from again litigating the claim thus settled as the final judgment of a court of competent jurisdiction, to the effect that the rights of the parties are as they are set forth in the agreement, and such a contract is always upheld by the courts"—citing Kercheval v. Doty, 31 Wis. 476, 484; Bank v. McGeoch, 92 Wis. 286, 313, 66 N. W. 606, 614; Hennessy v. Bacon, 137 U. S. 78, 11 Sup. Ct. 17, 34 L. Ed. 605; Van Trott v. Wiese, 36 Wis. 439; Zimmer v. Becker, 66 Wis. 527, 29 N. W. 228; Woodford v. Marshall, 72 Wis. 132, 39 N. W. 376.

[3] Moreover, such agreements will not be disturbed, even upon charges of fraud, or where, if intelligently and purposely entered into, because they turn out differently from what was anticipated, and the burden will always be upon those attacking the same to make out their charges by clear and unequivocal testimony. Chicago & N. W. Ry. Co. v. Wilcox, supra, 116 Fed. 913, 54 C. C. A. 147, and cases cited.

It is further insisted, in behalf of the Virginia Company and its assignees, that their view of the transaction is sustained by the supplemental contract of July 15, 1920, and that under it, especially section 1 thereof, it is manifest the title to the property purchased is vested in the government, and not in the purchaser. Undoubtedly a casual reading of this section gives some color and support to the contention made; but when it is taken into account that apparently the chief purpose of the July 15, 1920, contract was to procure the release by the government of its two liens upon the plant for $750,000 and $394,182.-

22, respectively, accepting in lieu thereof the guaranty of the Virginia Company to complete certain contracts and the payment of certain indebtedness of the Groton Iron Works, in which the Fleet Corporation was interested, and to secure the consent of the Fleet Corporation to the execution by the Virginia Company of a mortgage of $2,000,000 on its plant, to raise money for the sole purpose of carrying out the adjustment agreement of September 25, 1919, and the completion of hulls Nos. 8, 9, and 10, it becomes manifest that the July, 1920, contract (observe specially sections 2, 6, 7, and 8) was intended to strengthen and carry out the adjustment agreement of September 25, 1919, under which the ships were bought and sold, and not in any manner to weaken, frustrate, and destroy the effect of the same.

A careful reading of section 1 of the contract of July, 1920, in the light of section 4 of the same contract, and subsection (e) of section 9, and sections 10 and 11 thereof, makes it plain that the carrying out of the contract of sale under the adjustment agreement of September 25, 1919, was what was intended, and that the liquidation of the balance of the purchase money due to the Fleet Corporation thereunder was ever apparent in the mind of the draftsman, although the manner of finally concluding the transaction in the matter of form, by reason, possibly, of the unsatisfactory working of the old way, and the fact that greater delay than was first contemplated in closing the same would likely occur, still it was always manifest that it was the sum due and outstanding under the contract of purchase that was to be settled for, and that the ships were to be held for only such purpose, and that title to them should relate back to and become effective in the Virginia Company and its assignees, as of the original date of delivery to them. At every stage, as holders of the equity of redemption therein, the Virginia Company's rights were fully recognized and respected, and, in determining the relative rights and liabilities of the parties thereunder, one of the crucial tests should be, what are the rights and what may the purchaser do under the contracts?

[4, 5] In the court's view, taking the original and two supplemental agreements together, there can be no doubt that the rights of the Virginia Company and its assignees, have been fully recognized and kept alive, and there has never been a moment since the adjustment agreement of September 25, 1919, was entered into, to the present time, that the Virginia Company and its assignees could not, upon complying with the terms of sale, certainly by paying for the ships, demand and take possession of them. This was its right under the contracts; it is what it contracted for, and what was believed to be valuable at the time of purchase, and the fact that the value of vessel property has since changed and immensely depreciated, does not alter the rights and liabilities of the parties. The consequences may be serious and most disastrous financially; but this does not entitle one of the parties to visit its misfortune on the other. The purchaser cannot and should not be allowed to occupy the favored position of carrying out its contract, when to its present advantage, and repudiate it, if against its then interest. The right of the purchaser to demand the enforcement of the contract is determinative of liability under the same, when seeking

to escape responsibility thereunder, and to visit its losses upon the seller.

These transactions may be looked at from another standpoint, and much light gained thereby; that is, the existence of well-known shipping conditions, prominently that between the entering into of the contract of December 7, 1917, and the date of the adjustment agreement of September 25, 1919, the value of ships had so greatly increased, that C. W. Morse & Co., Inc., promoter and virtual owner of the several companies, acting in concert with the Virginia Company, was willing to purchase and take over the ships built by the latter, at $225 per dead weight ton, namely, $2,215,000 per ship. At this time, C. W. Morse & Co., Inc., gave as the reason for its desire to purchase that the Virginia Company also a Morse Company, while owner of the yard, was without means to operate it, and that C. W. Morse & Co., Inc., wished to arrange for the operation of the yard for five years, and would furnish work to keep it fully employed for that period. Accordingly the Virginia Company transferred its rights under the contract to the ships in question to C. W. Morse & Co., Inc., who in turn transferred the same to the United States Transport Company, an operating company controlled by it, taking in payment for the same $25,000,000 of the capital stock of the Transport Company. This was when the prices for vessels and freight rates were at their peak, and the government had already discontinued its shipbuilding policy. Prices soon thereafter rapidly declined, until prior to the time of the seizure of the ships involved, in the spring of 1921, they were a drug on the market, and could not be profitably operated at all, as was evidenced by the experience of the Virginia Company and its assignees, and those acting in concert with it, in handling the ships, nine of which pursuant to the contract aforesaid, were in their hands, and under their control. These conditions as to values and freight rates have continued to the present time. It has long been impossible to operate the ships at all, and they are now lying at anchor waiting the decision of the court in this litigation.

The fact that the Virginia Company and those acting with it were anxious to acquire the ships at the time they were purchased by them, and sold and transferred to C. W. Morse & Co., Inc., who in turn assigned them to the Transport Company, and now wish to be relieved from such ownership at a time when the ships have become almost worthless, and fall back to the former position of construction contractor under the first contract of December 7, 1917, instead of that of purchaser under the adjustment agreement, is only too apparent. To have the government make good to the Virginia Company, and those claiming under it, the profits that would have been earned under the construction contract, and relieve them from their liability as purchasers, and return to them the advances made by the Virginia Company on the purchase of ships, would be a most desirable position to occupy, but in its result would be very unfair to the government. If the Virginia Company, C. W. Morse & Co., Inc., and the Transport Company, as to the purchase of the ships in question one from the other, are not estopped from now asserting that they are neither pur-

chasers nor owners of the property, they should at least not be allowed to visit their losses upon the government, arising from what has developed to be an undesirable contract of purchase on their part.

[6] The Virginia Company and its associates insist that the adjustment agreement of September 25, 1919, and the supplemental contract of July 15, 1920, have each been rescinded by the abandonment and renunciation thereof by the government, and the seizure of the ships in question, and that such action on the part of the government operated to terminate, cancel, rescind, and annul the said contracts; that the seizure was not justified by any of the provisions of the contracts, or warranted by any neglect or default on the part of the Virginia Company; and that its rights should now be determined under the construction contract of December 7, 1917, and the accounts settled and adjusted on that basis. The rescission of the contracts between the parties as contended for would, of course, affect most seriously their rights thereunder respecting the subject of the litigation, and doubtless change the same entirely, if the proof sustained the claim of rescission and the effort to avail thereof had been promptly and timely interposed. This defense, however, came late in these proceedings, and is quite inconsistent with the position of the Virginia Company theretofore. Grymes v. Sanders, 93 U. S. 55, 62, 23 L. Ed. 798; Hennessy v. Bacon, supra, 137 U. S. 78, 85, 11 Sup. Ct. 17, 34 L. Ed. 605; McLean v. Clapp, 141 U. S. 429, 432, 12 Sup. Ct. 29, 35 L. Ed. 804; Ward v. Sherman, 192 U. S. 168, 176, 24 Sup. Ct. 227, 48 L. Ed. 391; Pollock's Principles of Contracts, p. 515.

In the court's view it cannot be successfully maintained here that the seizure of the ships was not warranted under the facts and circumstances existing. The right so to do was clearly within the spirit and provisions of each of the three contracts under consideration, as well as under the contemplated standard forms of bills of sale and mortgages provided for in the contracts. Moreover, the government was acting well within its rights, and its duty required it to seize the ships at the time it did, in order to prevent serious losses arising from attachments or maritime liens and like claims, as well as for the failure to successfully operate the vessels. The rights of the government, and of all parties interested in the ships, were being hazarded, and prompt and decisive action was called for. Those acting in behalf of the government, the Shipping Board and the Emergency Fleet Corporation, had shown great liberality in their dealings with and the utmost consideration of the rights of the Virginia Company and those acting with it, throughout the entire transaction, notwithstanding that the latter were, and had been at almost every stage of the business, greatly in arrears, and in default in carrying out their undertakings under their contracts, and they have no just cause of complaint against any action taken by the government looking to the enforcement of its rights, and the reduction of its losses, as far as possible.

This leaves but one question calling for action at this time, namely, the effect of the releases of the government's liens upon the plant, tools, machinery, and other property covered by the two deeds of trust of May 15, 1918, to Samuel G. Brent and Gardner L. Boothe, trustees,

and of January 10, 1920, to Gardner L. Boothe, trustee, the first to secure an indebtedness of $750,000, and the second a balance of $394,-182.22. and the substitution in lieu thereof of another mortgage to the Commercial National Bank of Washington, D. C., dated the 1st of January, 1921, to secure a bonded indebtedness of $2,000,000. In the view of the court, the releases of the first two deeds of trust, by and with the consent of the Emergency Fleet Corporation and the United States Shipping Board, are valid and legal, and operate to relinquish the liens of the said two deeds of trust to Brent and Boothe, trustees, upon the property, and that the lien for $2,000,000 to the Commercial National Bank, trustee, constitutes a valid and existing lien upon all the property embraced within such last-named mortgage. No opinion, however, is expressed upon the relative rights of the holders of the obligations secured under the $2,000,000 mortgage aforesaid, or any of the same, as the facts respecting that feature of the case were not sufficiently included within the hearing before the court to warrant the determination of the rights of the parties.

A decree will be entered, upon presentation, determining the rights of and fixing the basis for the adjustment of the accounts between the parties, in accordance with the views herein expressed.